The Honorable Paul Miller State Senator Post Office Box 488 Melbourne, AR 72556-0488
Dear Senator Miller:
I am writing in response to your request for my opinion regarding various questions relating to the following reported circumstances:
 In 1980, the citizens of Horseshoe Bend voted to establish a Municipal Recreation Improvement District (MRID). The City of Horseshoe Bend established the MRID with three appointed commissioners.
Following the submission of your request, the mayor of Horseshoe Bend, having been informed by you of the request, provided me with the following documents:
 • A letter from the mayor to me, dated March 4, 2005, informing me that in December of 2003 he had requested from the Arkansas Municipal League an opinion regarding the procedure whereby the original MRID assessments might be increased.
 • Correspondence, dated December 15, 2003, from the Arkansas Municipal League to the mayor opining that only the city council could adjust the assessments by amending its original ordinance declaring the amount of the assessments.
 • A copy of a signed, representative petition, dated June 20, 1980, supporting formation of the MRID.
 • A copy of Horseshoe Bend Ordinance No. 80-06, establishing the MRID and appointing three MRID commissioners.
 • A copy of Horseshoe Bend Ordinance No. 81-01, restating the purposes of the MRID, reciting the estimated cost of the improvements and establishing the assessments to finance the improvements.
 • A document, captioned "Trust Agreement," pursuant to which the bankruptcy trustee of Horseshoe Development Corporation conveyed various designated properties and amenities to the MRID conditioned upon the MRID's maintenance and operation of the conveyed property and amenities in accordance with the MRID's purposes.
Against this backdrop, you have posed the following questions:
 1. Under ACA 14-90-201, a city council is authorized to appoint three electors of the city who shall constitute a board of assessment. Can the three electors appointed also be members of an improvement district?
 2. Can the three commissioners appointed by the city council also serve as assessors of an improvement district?
 3. Does ACA 14-90-603 give the commissioners the authority to readjust the assessment on property from time to time if it is deemed necessary to pay for existing improvements and continued operation?
 4. Does ACA 14-90-701 give the Improvement District Commissioners the authority to request an increase in improvement district assessments in order to guarantee the future operation of an improvement district and subsequently require the city council to levy the necessary recommended increase as long as such increase meets the requirements of existing law?
 5. Does ACA 14-90-101 et seq. apply to the Municipal Recreation Improvement District (MRID) of Horseshoe Bend?
RESPONSE
In my opinion, the answer to your first question is "yes." I believe the answer to your second question is "no," unless a local ordinance expressly allowed otherwise. See A.C.A. § 14-42-107(b)(1). I believe the answer to your third question is likewise "no." Section 14-90-603 of the Code authorizes adjusting assessments "according to additional improvements," not to pay for "existing improvements and continued operation." I believe the answer to your fourth question is "no" for virtually the same reason. The commissioners could not "meet the requirements of existing law" by directing an increase in assessments "in order to guarantee the future operation of an improvement district"; A.C.A. § 14-90-701 authorizes such an increase only "to complete a municipal improvement or pay therefor." In my opinion, the answer to your fifth question is "yes," except as expressly provided otherwise in chapter 90 of title 14 of the Code.
Question 1: Under ACA 14-90-201, a city council is authorized to appointthree electors of the city who shall constitute a board of assessment.Can the three electors appointed also be members of an improvementdistrict?
I believe the answer to this question is "yes."
Chapter 90 of title 14 of the Arkansas Code (Repl. 1998) addresses the assessment procedures applicable in certain municipal improvement districts.[1] Section 14-90-201 provides:
 As soon as a municipal board of improvement shall have formed a plan and shall have ascertained the cost of the improvement, it shall report this plan to the city or town council. The council shall appoint three (3) electors of the city or town who shall constitute a board of assessment to review the benefits to be received by each lot or block or other subdivision of land within the improvement district by reason of the proposed local improvement.
With respect to the referenced "municipal board of improvement," A.C.A. § 14-88-301 (Supp. 2003) provides in pertinent part:
 (a)(1)(A)(i) In the ordinance creating a municipal improvement district, the city or town council shall appoint three (3) owners of real property therein as commissioners, who shall compose a board of improvement for the district.
 (ii) The number of commissioners for any improvement district created under this section may be increased by ordinance of the city or town council from three (3) to five (5) members.
Horseshoe Bend Ordinance No. 80-06, which created the MRID and appointed three commissioners, tracks the model language set forth in A.C.A. §14-88-301(b).[2]
I assume that the phrase "members of an improvement district" in your question refers to property owners within the district who are subject to assessment. Your question, then, appears to be whether a property owner affected by the assessment of benefits on his property within an improvement district can serve on the board of assessment without creating a conflict of interest.
Section 14-90-201 dictates that the members of a board of assessment be "electors of the city or town" that contains the improvement district. It is unclear whether this provision is premised on an assumption that the district will comprise the entire city or town, meaning that the members of the board of assessment will all be residents of the district. However, for the purpose of responding to your question, what matters is only that the statute in no way qualifies the term "electors" by reciting a condition that the assessors not own property subject to assessment within the district. Accordingly, I believe the legislature has determined that an elector will not be disqualified from service on the board of assessment merely because he has a possible interest in the assessment of benefits by virtue of his owning property within the district.
However, I must qualify this opinion by pointing out that in determining whether to participate in the process of assessing the benefits that will accrue to his own property as a result of the improvement, any assessment commissioner will be subject to the following condition:
 No public official or state employee shall use or attempt to use his or her official position to secure special privileges or exemption for himself or herself or his or her spouse, child, parents, or other persons standing in the first degree of relationship, or for those with whom he or she has a substantial financial relationship that is not available to others except as may be otherwise provided by law.
A.C.A. § 21-8-304(a) (Supp. 2003). He will further be subject to the common-law proscription against conflicts of interest, which one of my predecessors summarized as follows:
 The common law prohibition against conflicts of interest is reflected in the following description of the public policy underlying the principle:
 A public office is a public trust . . . and the holder thereof may not use it directly or indirectly for personal profit, or to further his own interest, since it is the policy of law to keep an official so far from temptation as to insure his unselfish devotion to the public interest. Officers are not permitted to place themselves in a position in which personal interest may come into conflict with the duty which they owe to the public, and where a conflict of interest arises, the office holder is disqualified to act in the particular matter and must withdraw.
 67 C.J.S. Officers § 204. See also Ops. Att'y Gen. 2001-042; 2000-072; 99-349; 98-275; 94-283; and 94-446, citing Van Hovenberg v. Holman, 201 Ark. 370, 144 S.W.2d 719 (1940); Madden v. United States Associates, 40 Ark. App. 143, 844 S.W.2d 374 (1992); Acme Brick Co. v. Missouri Pacific R.R., 307 Ark. 363, 821 S.W.2d 7 (1991); and 63A Am. Jur. 2d, Public Officers and Employees § 321.
Ark. Op. Att'y Gen. No. 2002-273 (emphases added). In Ark. Op. Att'y Gen. No. 2003-007, I offered the following analysis of this issue:
As my predecessor noted in Ark. Op. Att'y Gen. No. 95-099:
 The "conflict of interest theory" is based "on the fact that an individual occupying a public position uses the trust imposed in him and the position he occupies to further his own personal gain. It is the influence he exerts in his official position to gain personally in spite of his official trust which is the evil the law seeks to eradicate." City of Coral Gables v. Weksler, 164 So.2d 260, 263
(Fla.App. 1964). See also generally 63A Am. Jur. 2d Public Officers and Employees § 321 (1984).
 In Ark. Op. Att'y Gen. No. 93-184, my predecessor summarized the operative inquiry as being whether the officer "has a personal interest which might interfere with the unbiased discharge of his duty to the public." The furtherance of the officer's personal interest is thus the focal point of inquiry in determining whether an unlawful conflict of interest exists at common law. See Van Hovenberg v. Holman, 201 Ark. 370, 144 S.W.2d 719 (1940).
(Emphasis added.)
In my opinion, a finder of fact might well apply the above principles to conclude that an assessment commissioner's personal stake in assessing the benefits accruing to his own property as the result of an improvement in itself would preclude his participating in the assessment of that property.
Question 2: Can the three commissioners appointed by the city councilalso serve as assessors of an improvement district?
In my opinion, the answer to this question is "no."
Your question requires me to apply certain legal principles that control in determining whether an individual may hold dual offices. The Arkansas Supreme Court has held that there are three possible types of legal prohibitions to the concurrent holding of two offices: constitutional prohibitions, statutory prohibitions, and, if no constitutional or statutory prohibition applies, the common-law prohibition known as the "doctrine of incompatibility." Byrd v. State, 240 Ark. 743, 744-45,402 S.W.2d 121 (1966). No constitutional proscription would bar the referenced dual service. However, in my opinion, unless a city ordinance expressly indicated otherwise, dual service as an improvement district commissioner and a district assessment commissioner would violate a statutory prohibition. The existence of a statute addressing this question renders inapplicable the common-law doctrine of incompatibility.
The statute I believe applies in this instance is A.C.A. §14-42-107(b)(1) (Supp. 2003), which provides:
 No alderman, council member, official, or municipal employee shall be interested, directly or indirectly, in the profits of any contract for furnishing supplies, equipment, or services to the municipality unless the governing body of the city has enacted an ordinance specifically permitting aldermen, council members, officials, or municipal employees to conduct business with the city and prescribing the extent of this authority.
District commissioners and assessment commissioners are clearly "officials" of the municipality that appointed them and hence fall within the scope of this statute. Both of these offices are filled and potentially vacated by action of the municipality's governing body. See
A.C.A. §§ 14-88-301(a) (locating in the city or town council the power to appoint district commissioners); 14-88-303 (Supp. 2003) (locating in the city or town council the power to fill vacancies on the district commission); 14-88-305 (Supp. 2003) (locating in the city or town council the power to remove members of the district commission); 14-90-201
(Repl. 1998) (locating in the city or town council the power to appoint members of the board of assessment). No statute directly addresses who has the power to remove members of the board of assessment, but A.C.A. §14-42-109(a)(2) (Repl. 1998) locates in the city or town council the power by ordinance to remove such appointed officers. Both varieties of commissioner take an oath of office. A.C.A. § 14-88-302 (Repl. 1988) (district commissioners); A.C.A. § 14-90-202 (district assessors). The commissioners' qualifications are established by law. A.C.A. §14-88-301(a). And clearly, both district commissioners and assessors exercise some part of the state's sovereign power. According to well established precedent, these factors signify the creation of a public office. See generally Martindale v. Honey, 259 Ark. 416, 533 S.W.2d 198
(1976); Haynes v. Riales, 226 Ark. 370, 290 S.W.2d 7 (1956); and Maddoxv. State, 220 Ark. 762, 249 S.W.2d 972 (1952).
Two aspects of the relationship between these two types of commissioner persuade me that a single individual should not serve in both capacities. First, pursuant to A.C.A. § 14-90-203, the district commission has the authority to set the salaries of assessment commissioners. Second, pursuant to A.C.A. § 14-90-602(a), district commissioners can require a board of assessment to revise its assessments, "increasing or diminishing the assessment against particular pieces of property as justice may require."
In my opinion, the fact that a district commissioner would have the power both to set his own salary as a member of the board of assessment and to determine the frequency of assessments performed by the board would create a clear conflict under A.C.A. § 14-42-107(b)(1). The Arkansas Supreme Court found occasion to interpret this statute in Thompson v.Roberts, 333 Ark. 544, 970 S.W.2d 239 (1998), which addressed whether a mayor could simultaneously serve in that office and as a paid bookkeeper for the city. The court offered the following analysis in holding that the arrangement violated A.C.A. § 14-42-107(b)(1):
 [U]nder the plain language of the statute, a position as a city's bookkeeper may be seen as a contract for services. Such an interest is prohibited by section 14-42-107(b)(1) absent an authorizing ordinance.
333 Ark. at 550. In my opinion, a position as an assessment commissioner likewise involves a contract for services, and as such would be incompatible with holding another office absent an authorizing ordinance. I have not been informed that the Horseshoe Bend City Council has ever enacted any such ordinance. See also Ark. Op. Att'y Gen. No.2004-126 (opining that in the absence of an authorizing statute, A.C.A. § 14-42-107(b)(1) precluded dual service as a city director and an airport manager).
Given my conclusion that A.C.A. § 14-42-107(b)(1) would bar the dual service absent an authorizing ordinance, I need not address whether the dual service would have been barred under the common-law doctrine of incompatibility. Statutory law in this case would apply either to bar the dual service or, if an ordinance authorized doing so, to allow it. This statute would supersede what might otherwise have been the application of common law.
Question 3: Does ACA 14-90-603 give the commissioners the authority toreadjust the assessment on property from time to time if it is deemednecessary to pay for existing improvements and continued operation?
In my opinion, the answer to this question is "no."
Section 14-90-603 of the Code provides:
 A municipal improvement district assessment may be annually readjusted according to additional improvements placed upon the lands and railroad tracks and rights-of-way when a succession of collections is necessary to pay for the improvements.
(Emphasis added.) The highlighted term "additional improvements" is distinguishable from the term "existing improvements and continued operation" contained in your question. In my opinion, on its face, A.C.A. § 14-90-603 authorizes reassessing only for the purpose of financing "additional improvements," not for the purpose of financing "existing improvements and continued operation."
Question 4: Does ACA 14-90-701 give the Improvement DistrictCommissioners the authority to request an increase in improvementdistrict assessments in order to guarantee the future operation of animprovement district and subsequently require the city council to levythe necessary recommended increase as long as such increase meets therequirements of existing law?
In my opinion, the answer to this question is "no." I do not believe the commissioners could order a reassessment of property "in order to guarantee the future operation of an improvement district" without violating "the requirements of existing law."
Section 14-90-701 of the Code provides as follows regarding the role of the city council in effecting reassessments:
 If the tax first levied shall prove insufficient to complete a municipal improvement or pay therefor, the board of improvement shall report the amount of the deficiency to the council, and it shall thereupon levy further taxes based on the assessment of benefits for a sum sufficient to complete the improvement or pay therefor, which shall be collected in the same manner as the first levy. However, the taxes levied shall never exceed the total amount of the benefits assessed or the limitation of cost fixed in the petition or by this act.
(Emphasis added.) The Arkansas Supreme Court has declared that a city council may relevy in this manner without any new petition being filed.Earl v. Board of Improvement of Morrilton, 70 Ark. 211, 67 S.W. 312
(1902).
At issue in your question is whether the commissioners are authorized by this statute to direct that the city council levy a specified increase in assessments in order to finance the "future operation" of the district. In my opinion, the statute does not envision reassessing to fund "future operation," but rather addresses only relevying to complete the improvement itself or to pay for the construction of the improvement. Accordingly, I believe it would be impermissible for the commissioners to direct a relevy of assessments for the purpose recited in your question.
Although your question refers only to A.C.A. § 14-90-701, I believe this statute should be read in conjunction with A.C.A. § 14-90-602, which provides in pertinent part:
 (a) The commissioners of any municipal improvement district may require the assessors thereof to revise their assessment not more often than once per annum, increasing or diminishing the assessment against particular pieces of property as justice may require. However, the total amount of benefits shall never be diminished if the district shall have borrowed money or incurred indebtedness.
* * *
 (c) Where assessments of benefits are revised in pursuance of this section, and notice is given as provided, the assessments shall be final and conclusive unless suit is brought in the chancery court within thirty (30) days after the publication of the notice provided for in subsection (b) of this section for the purpose of correcting the assessment.
This statute invests the district commissioners with discretion to determine what increase or decrease in assessments will apply, subject to a right of challenge in the courts.[3] (The statute does not even mention the city council.) However, this discretion is significantly qualified in one respect. In Maumelle Blvd. Water Sewer Dist. No. 1v. Davis, 315 Ark. 353, 359, 868 S.W.2d 73 (1993), the court offered the following proviso regarding the operation of A.C.A. § 14-90-602:
 Under section 14-90-602 of the Arkansas Code Annotated of 1987, assessments may be revised by an improvement district on an annual basis, either by increasing or diminishing the assessment against a particular piece of property as justice may require. We have held that assessments cannot be increased or diminished except for some physical change that occurs in the property after the original assessment. Street Improvement Dist. No. 74 v. Goslee, 183 Ark. 539, 36 S.W.2d 960
(1931). A material physical change is a basis upon which a property owner may obtain, by direct action, a reassessment of benefits for future periods. See Sugarloaf Dev. Co., Inc. v. Heber Springs Improvement Dist., 34 Ark. App. 28, 805 S.W.2d 88 (1991); Paving Dist. No. 2 v. Johnson, 186 Ark. 1033, 57 S.W.2d 558 (1933); Benton v. Nowlin, 187 Ark. 738, 62 S.W.2d 16 (1933); Street Improvement Dist. No. 74 v. Goslee, 183 Ark. 539, 36 S.W.2d 960 (1931); Missouri N. Ark. Ry. Co. v. Little Red River Levee Dist., 172 Ark. 792, 290 S.W. 363 (1927).
(Emphasis added.)
At first blush, A.C.A. §§ 14-90-602 and -701 might appear to be in conflict, inasmuch as the former appears to authorize an improvement commission directly to levy a reassessment, subject to possible judicial challenge, whereas the latter clearly provides for the city or town council to levy the assessment, albeit in an apparently ministerial capacity at the behest of the improvement commission. If at all possible, I am obliged to reconcile any two statutes that address the same issue. See Darr v. Bankston, 327 Ark. 723, 726, 940 S.W.2d 481 (1997). In the present case, notwithstanding the fact that A.C.A. § 14-90-602 is silent on the role of the city council in the reassessment process, I believe A.C.A. § 14-90-701 supports concluding that the city or town council is obliged in a ministerial capacity formally to levy the assessment once it is "final and conclusive" pursuant to the provisions of A.C.A. § 14-90-602(c).[4] See City Council of Camden v. Merchants Planters Bank, 191 Ark. 1139, 1140-41, 89 S.W.2d 739 (1936) (describing a procedure under prior law pursuant to which the commissioners petitioned the city council to levy the reassessment once the appeals period had run).
As you may have gathered from the foregoing discussion, I hardly consider these statutes models of clarity, and I consider it a challenge to attempt reconciling their terms. However, specifically for purposes of responding to your questions, I do not believe either statute authorizes relevying assessment by any procedural means when the purpose of the proposed reassessment would be to finance the operation of an existing, materially unchanged improvement. Having offered this opinion, I will add that legislative or judicial clarification regarding the procedure to be followed in relevying would appear to be warranted.
Question 5: Does ACA 14-90-101 et seq. apply to the Municipal RecreationImprovement District (MRID) of Horseshoe Bend?
In my opinion, the answer to your question is "yes."
I suspect your question may have been prompted by the inclusion in the Code of A.C.A. § 14-90-102(a), which provides:
 (1) All municipal improvement districts created after June 9, 1949, shall be governed by the provisions of §§ 14-88-401, 14-88-404, 14-90-102, 14-90-801, 14-90-802, 14-90-901 — 14-90-915, 14-90-1002, 14-90-1107, 14-90-1301, 14-90-1303(a)-(b), 14-90-1405, and 14-90-1406.
 (2)(A) All municipal improvement districts existing on June 9, 1949 shall continue to function under laws existing prior to June 9, 1949 except with respect to foreclosure suits.
 (B)(i) Within sixty (60) days after any annual installment becomes delinquent, the board of commissioners shall proceed in accordance with the provisions of §§ 14-90-911, 14-90-1002, 14-90-1301, 14-90-1405, and 14-90-1406, excepting the first sentence of § 14-90-1002.
 (ii) Sections 14-90-1107, 14-90-1301 and 14-90-1303(a)-(b) shall also be applicable to municipal improvement districts existing prior to June 9, 1949.
This statute clearly applies to the MRID, which you report was formed in 1980.
I will not attempt to minimize the avoidable confusion of this statute, which needlessly leaves open the question of whether the only provisions that will govern improvement districts created after June 9, 1949 are those recited in subsection (a)(1). The statute appears primarily intended to mandate that the provisions of Acts 1949, No. 195, which contains all of the provisions referenced in subsection (a)(1), will necessarily apply to districts formed following the enactment of Act 195.[5] The legislation further mandates that all municipal improvement districts, including those already in existence as of the effective date of Act 195, will be governed by the Act's foreclosure provisions. See Act 195, § 25.
In my opinion, except as expressly provided in the statute, A.C.A. §14-90-102(a) should not be read as foreclosing the application of the other substantive and procedural requirements set forth in chapter 90 of title 14 of the Code — or, for that matter, of any other provision of the Code. See, e.g., Ketcher v. Mayor of North Little Rock, 2 Ark. App. 315,621 S.W.2d 12 (1981) (acknowledging the propriety of appointing district commissioners pursuant to chapter 88 of title 14 and assessment commissioners pursuant to chapter 90 of title 14). As its title suggests, chapter 90 of title 14 deals comprehensively with "Assessments by Municipal Improvement Districts." A.C.A. § 14-90-102(a). With respect to improvement districts falling within the ambit of A.C.A. §14-90-102(a), all the provisions of chapter 90 should apply unless expressly excepted. This conclusion is consistent with § 27 of Act 195 of 1949, which repeals only those laws "applicable solely to municipal corporations which are in conflict herewith."
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB: JD/cyh
[1] With respect to the applicability of these procedures to the MRID, see my response to your fifth question.
[2] By comparison, Horseshoe Bend Ordinance No. 81-01, which recites the costs of and imposes the assessments to finance the MRID project, tracks the language set forth in A.C.A. § 14-90-802. As noted in the text of this opinion, chapter 90 of title 14 deals only with assessment procedures, not with the formation of a district.
[3] I should note that A.C.A. § 14-90-501 provides that an aggrieved property owner may appeal an assessment to the city council within 10 days of the posting of notice. In Paving District No. 3 v. Fowler,192 Ark. 1122, 96 S.W.2d 951 (1936), the court held that the avenue of appeal to the city council is unavailable to one aggrieved by a reassessment because jurisdiction to revise reassessments lies exclusively in chancery court pursuant to what is now A.C.A. § 14-90-602.
[4] In this regard, I will note that my opinion might be read as diverging from that offered by the Arkansas Municipal League in the letter opinion provided me by Horseshoe Bend Mayor Bob Spear. In the opinion of the Municipal League, only the Horseshoe Bend City Council, as opposed to the MRID commissioners, may effect a reassessment. I agree with this opinion to the extent that the ultimate act in the process of reassessment would appear to be a levy by the city council. Nevertheless, as noted in the text of my opinion, I believe that the MRID commissioners are charged with the ultimate authority to reassess and that they may direct the city council to levy the reassessment. Although, as the Municipal League notes, A.C.A. § 14-88-202 indeed charges the city or town council with the authority to assess the benefits to property contained within an improvement district, it exercises that authority through a board of improvement, A.C.A. §14-88-301, which is invested with the discretion independently to determine when a reassessment shall occur, A.C.A. § 14-90-602.
[5] I cannot explain why legislation designed to apply to municipal improvement districts formed after its effective date contains a provision that the legislation declares to be inapplicable. See Act 195, § 25 ("excepting the first sentence of Section 19," which authorizes the board of commissioners to institute a suit to collect delinquencies). A.C.A. § 14-90-102(a)(2)(B)(i). The collection of delinquent improvement district taxes or assessments has been transferred to the county tax collector by A.C.A. § 14-86-1001 (Repl. 1998).